# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES DANIEL PRIMM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 CV 6173 |
| v. | ) | |
| | ) | Judge Thomas M. Durkin |
| NANCY BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Charles Daniel Primm brings this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the Commissioner of Social Security denying Primm's claim for disability insurance benefits. The parties have filed cross motions for summary judgment. Dkt. 8; Dkt. 13. For the following reasons, the Commissioner's motion is granted, and Primm's motion is denied.

## Background[1]

Primm is 52 years old but was under age 50 at all times relevant to the proceedings. R. 44, 207. He has a twelfth-grade education and lives with his wife. *Id.* at 44, 72. From 1987 until 2006 Primm worked as a baggage handler for United Airlines and was required to lift a minimum of seventy-five pounds. *Id.* at 44-46. He injured his knee on the job in 1998 and subsequently had knee surgery. *Id.* at 45. Primm suffered another work injury in May 2006, when he injured his right shoulder, elbow, and neck. *Id.* at 46. He has not returned to work since. *Id.* at 57.

---

[1] References to the Administrative Record (Dkt. 7) are cited as R. #.

## I. Procedural History

In March 2014, Primm filed an application for disability insurance benefits alleging disability since May 2006 due to a torn rotator cuff, cubital tunnel syndrome, and bulging discs in his neck. *Id.* at 88-89, 174. Primm's claim was denied on July 22, 2014, and again upon administrative reconsideration on February 27, 2015. *Id.* at 113, 118. Primm then filed a timely request for a hearing before an Administrative Law Judge (ALJ), which was held on August 31, 2016. *Id.* at 10. In his Pre-Hearing Memorandum, Primm alleged that in addition to the impairments initially before the Commissioner, he was obese and suffered from depression and anxiety. *Id.* at 256. Then, at the hearing, Primm's counsel listed cubital tunnel syndrome, aggressive left disc herniation C5/C6, right medial epicondylitis, a 1998 knee surgery, and obesity as Primm's medically determinable severe impairments. *Id.* at 43. On March 22, 2017, the ALJ upheld the decision to deny benefits. *Id.* at 10. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision for purposes of judicial review. *Id.* at 1. Primm then filed this complaint on August 24, 2017 pursuant to 42 U.S.C. § 405(g) for review of the Commissioner's decision. Dkt. 1. Primm last met the insured status requirements on June 30, 2014. R. 118. Thus, to qualify for benefits, Primm's disability must be established on or before that date. 20 C.F.R. § 404.131.

## II. Medical and Other Evidence

Following Primm's May 2006 work injury, Primm was treated by Dr. Eugene Lopez, an orthopedic surgeon at Midwest Sports Medicine, and Dr. Bruce Montella,

an orthopedic surgeon and spine specialist at the same practice. He also received a functional capacity evaluation, three independent medical evaluations, a vocational evaluation, and consultative evaluations ordered by the Social Security Administration in connection with this claim. The Court addresses the evidence chronologically below.

### A.    2006 – 2007

Primm became a regular patient of Dr. Lopez's when he began treatment for his pain and other issues with his right shoulder, elbow, wrist, and hand, and with his cervical spine. During the course of treatment, Dr. Lopez ordered x-rays of Primm's right elbow and shoulder, magnetic resonance imaging (MRIs) of his right elbow and shoulder and of his cervical spine, and electromyographies, and performed surgeries on his right shoulder and arm. *See, e.g.*, *id.* at 301, 307, 321, 322, 327-329, 377-378, 437-442. Simultaneous to his treatment with Dr. Lopez, according to a June 23, 2006 letter from Dr. Montella to Primm's primary care physician, Dr. Montella also was treating Primm for cervical spine issues. *Id.* at 326. The letter noted "ongoing difficulties with activity related pain consistent with cervical spine injury and radiculitis" and a goal to "maximize non-operative management including activity modification, anti-inflammatories, physical therapy modalities and chiropractic care," for Primm's "severe and debilitating" symptoms. *Id.* at 326. But Primm reported that his chief complaint at the time was his shoulder, and, on October 31, 2006, following an early set of MRIs and after steroids had failed to bring relief, Dr. Lopez performed arthroscopic rotator cuff repair surgery. *Id.* at 321, 322. Then, on

May 25, 2007, Dr. Lopez performed a cubital tunnel release on his right arm to address pain in his elbow. *Id.* at 301. Dr. Lopez reported good results from both surgeries, noting on March 8, 2007 after his shoulder surgery that Primm's EMG was normal, he "has done very well," and that he was "optimistic [Primm] will fully recover." *Id.* at 317-318. On July 30, 2007, following his cubital tunnel release surgery, Dr. Lopez stated that Primm "has done extremely well," that his "elbow feels great," and "he would like to return to light duty." *Id.* at 312-313. Dr. Lopez ordered physical therapy, prescribed anti-inflammatories, and put Primm in a work conditioning program, with the hope of returning him to work in a month. *Id.* at 312. But when Primm complained of cervical spine issues that same year, Dr. Lopez grew concerned. *Id.* He ordered another MRI in November 2017 and sent Primm to his colleague Dr. Montella. *Id.* The November 2007 MRI revealed "mild degenerative disc changes" with "more prominent abnormalities" in the mid cervical spine. *Id.* at 307.

In a December 2007 independent medical evaluation by Dr. Nikhil N. Verma of Midwest Orthopaedics at Rush, Primm reported "significant[ ] improve[ment]" in his shoulder and elbow pain. *Id.* at 347. Dr. Verma recorded Primm's "primary complaint" as "neck pain with numbness and tingling in all digits of his right hand." *Id.* Dr. Verma reviewed Primm's November 19, 2007 cervical spine MRI, and, after a physical examination, recommended either a second opinion or an independent medical evaluation by a cervical spine specialist because Primm did "appear to have some cervical discomfort with associated degenerative changes on his MRI scan and possible right upper extremity radiculopathy." *Id.* at 348-349. Dr. Verma concluded

that Primm could return to work without restrictions related to his shoulder or elbow, finding no "objective findings" to substantiate them. *Id.* at 349.

**B.    2008 – 2009**

Thereafter, a January 2008 letter from Dr. Montella to Primm's primary care physician indicated "difficulties with activity related pain referable to [Primm's] neck." *Id.* at 306. Dr. Montella wrote that it was "unreasonable for him to participate in work in any way," and that his issues were "ongoing, severe and debilitating." *Id.* at 306.

Later that month, Primm submitted to an independent medical evaluation by Dr. David L. Spencer, a scoliosis and spine surgeon at the Spine Center. *Id.* at 351-352, 353-354. Based on a physical examination and his review of Primm's MRIs and Dr. Verma's evaluation, Dr. Spencer concluded that Primm "is physically able to return to work at ramp service . . . with no limitations and no further treatment needed," and described his cervical spine complaints as "subjective . . . with no objective abnormalities." *Id.* at 354.

Then, in October 2008, Primm submitted to a functional capacity evaluation (FCE). *Id.* at 361. The FCE indicated Primm's ability to: work in the "light DOT[2] category;" lift from floor to waist up to 37 pounds occasionally and 19.5 pounds frequently; lift overhead up to 19.5 pounds occasionally and 10 pounds frequently; push up to 450 pounds and pull up to 350 pounds occasionally; climb stairs,

---

[2] "DOT" refers to the Dictionary of Occupational Titles, the publication the Social Security Administration uses for job descriptions.

repetitively squat, and kneel frequently; avoid crawling and only occasionally reach overhead; and avoid simple grasping, pushing/pulling and fine manipulation with his right hand, but constantly engage in each with his left. *Id.* at 361, 363. The FCE placed no restrictions on his ability to engage in repetitive lower extremity actions, or sit, stand, or walk during an 8-hour work day, but indicated that he should "avoid repetitive motions of the neck secondary to current neck condition." *Id.* at 363.

In May 2009, Primm submitted to another independent medical evaluation with spine specialist Dr. Spencer. Dr. Spencer remarked that "this man thinks that he has a cervical spine problem and needs cervical spine surgery but there is no evidence . . . that he is receiving any ongoing treatment that is consistent with a cervical spine condition that needs treatment." *Id.* at 372. Dr. Spencer opined that no further cervical spine treatment was necessary, but that he did not anticipate Primm returning to his previous work "because of his right upper extremity abnormalities, completely independent of his cervical spine." *Id.* at 373.

## C.    2010 – 2011

Thereafter, the record contains no evidence of Primm's treatment until April 2010, when Primm returned to Dr. Lopez and again complained about his right arm and shoulder. In response, Dr. Lopez ordered imaging of Primm's right elbow and shoulder, revealing as to his shoulder "an inadequate subacromial decompression distal clavicle restriction" and "post surgical changes vs partial insertional supraspinatus tendon tear, impingement, and rotator cuff tendinitis/bursitis." *Id.* at 303, 345, 346. Elbow imaging was normal. *Id.* at 345. Primm's symptoms remained

the same at subsequent appointments that year, and Dr. Lopez consistently prescribed medications for symptom relief (e.g., Mobic as an anti-inflammatory, Ambien as a sleep aid, Ultram for pain control, and Prilosec for digestion) and recommended that Primm return to "light duty" work, with restrictions of no repetitive work, no pushing or pulling, no overhead work, and lifting a maximum of 10 to 15 pounds. *See id.* at 262, 301-305, 338-339, 344-345, 414-416.

In March 2011, certified rehabilitation counselor Kari Stafseth of Vocamotive performed a vocational evaluation of Primm, in which she interviewed him and reviewed his October 2008 FCE and recently completed vocational testing. *Id.* at 267-279. Stafseth noted that Primm reported no difficulty with sitting, standing, walking, stooping, bending, kneeling, or climbing stairs, and that he had not attempted to climb a ladder, but that he had trouble crawling due to his right shoulder and arm. *Id.* at 269. Primm further reported that he could drive a car for 30 to 45 minutes before his right shoulder would become stiff, that he had to use his left arm most of the time and could not turn his head quickly, but had no difficulties using his feet to operate the foot controls. *Id.* He reported a stiff neck once a week. *Id.* According to Primm, he could perform a two-hand lift of 30 to 40 pounds occasionally, and 15 to 20 pounds frequently. *Id.* Primm stated that he could not lift weight overhead with his right arm, could forward reach only if he was not picking up any weight, but could flex and extend his right elbow, pronate and supinate his right forearm, and flex, extend, deviate, and rotate his right wrist. *Id.* He reported that his left upper extremity function was normal. *Id.* He also was independent in grooming, dressing,

bathing, toileting, food preparation and driving, but was unable to open jars or cans. *Id.* The report stated that the 2008 FCE was a valid representation of Primm's capabilities. *Id.*

In reviewing Primm's vocational testing report completed that same month, Stafseth indicated that "Mr. Primm was able to physically tolerate a full day of testing without complaint and completed all of the tasks and his writing with his left hand only." *Id.* at 270. Stafseth concluded that Primm did not have any transferable skills, was "functioning at the Light level of physical demand" at which he was "theoretically employable," but that additional computer training or as a security guard would be beneficial. *Id.* at 278. According to Stafseth, such training would make Primm "prospectively employable" as a security guard, customer service representative, or front desk associate. *Id.* at 279. But "based upon his narrow work history, lack of transferable skills, restrictions regarding use of the right dominant upper extremity and failed vocational rehabilitation effort," he had "disability which is total." *Id.*

In June 2011, the arbitrator in the workers' compensation case filed in connection with Primm's injuries determined that Primm's right arm and cervical conditions were the result of his May 2006 work injury and awarded maintenance benefits. *Id.* at 203, 205. The arbitrator's decision—which was based upon hearing testimony, medical records, Primm's meetings with a vocational counselor, and Stafseth's report—concluded that Primm was "theoretically employable at the light duty level; however, only in a very limited manner as a security guard." *Id.* at 206.

8

### D.    2014 – 2015

After an apparent three-and-a-half-year gap in care, Primm resumed treatment with Dr. Lopez in April 2014, reporting "shoulder pain and occasional right elbow pain" of 6 out of 10. *Id.* at 423. Examination revealed mild restrictions in elbow extension and supination, mild swelling over the lateral and medial elbow, weakness with wrist and finger extension, but normal wrist and finger flexion, abduction and sensation, and normal motor function in nerve distributions. *Id.* at 424. Dr. Lopez diagnosed right elbow medial and lateral epicondylitis, restarted physical therapy, and ordered an elbow brace, but opined that "Chuck should do well with conservative management. He has responded well in the past." *Id.* at 425, 434. Dr. Lopez also advised Primm to lift objects "with the palm up." *Id.* at 434. This was Primm's last visit of record before June 30, 2014—his date last insured. *Id.* at 118; 20 C.F.R. § 404.131.

At subsequent visits in 2014, Primm complained to Dr. Lopez of right elbow, wrist, and hand pain. R. 414, 420. On examination, Primm's elbow showed a mild decrease in range of motion and flexion due to pain, but strength testing for his wrist was 5/5, with normal range of motion, sensation, and reflexes, and normal motor function in his nerves. *Id.* at 421. He also had normal range of motion and alignment in his cervical spine and normal sensation, with 5/5 strength testing, no motor deficits, and normal rotator cuff strength testing. *Id.* at 415. Dr. Lopez recommended a home exercise program in lieu of physical therapy, medication for symptom relief, and light duty work, again with the consistent instructions that Primm avoid

repetitive and overhead work, pushing and pulling, and lifting up to 15 pounds. *Id.* at 416, 422, 438.

In July 2014 and February 2015, consultants for the Social Security Administration examined Primm in conjunction with his claim for disability insurance benefits, finding that he could perform medium exertional level work, occasionally lift and/or carry up to 50 pounds, and frequently lift and/or carry up to 25 pounds. *Id.* at 93, 95, 103, 105. They found Primm could stand and/or walk more than 6 hours on a sustained basis in an 8-hour workday, and that he was unlimited in his ability to push and pull, "other than as shown, for lift and/or carry." *Id.* at 93, 103-104. The examinations found no postural or manipulative limitations. *Id.* at 104.

Thereafter, at Primm's last visit of record with Dr. Lopez in April 2015, Primm had near full range of motion in his right elbow with 5/5 strength testing in his wrist flexors and extensors, elbow flexors and extensors, and normal sensations and symmetrical reflexes, and 5/5 strength in his cervical spine, with normal cervical alignment, range of motion, and sensation and reflexes. *Id.* at 408-409. Dr. Lopez again recommended home exercise and medication, and repeated the same work restrictions, describing them as "permanent." *Id.* at 409.

**E.     2016**

The last piece of record evidence is an October 2016 "Residual Functional Capacity Questionnaire" completed by Dr. Montella. *Id.* at 455. The Court notes that this questionnaire was completed over eight-and-a-half years after the last evidence

of Primm's treatment with Dr. Montella, and nearly two months after the hearing.[3] The questionnaire stated that Primm had been a patient since 2006 for his "cervical disc disorder with radiculopathy mid-cervical region," and described his neck pain as "chronic [sic] severe and debilitating," "which radiates into his right arm with numbness and tingling in addition to [right] shoulder and [right] elbow injuries." *Id.* It indicated that Primm suffered from headaches related to his spinal condition lasting about 4 hours each and occurring approximately 3 times per week, that he experienced personality and mood changes with medication but was not currently on medication, and that he suffered from depression. *Id.* at 456-457. The questionnaire further represented that Primm could: walk only ½-1 block without rest or severe pain; sit for only 20 minutes and stand for just 15 minutes at a time; sit and stand/walk for a total of 2 hours each during an 8-hour work day; and rarely twist, stoop, crouch/squat, or climb ladders or stairs. *Id.* at 457-458. It indicated that during an 8-hour work day Primm must walk every 20 minutes for 2 minutes, shift positions at will and take unscheduled breaks, and both lie down and move around during the breaks. *Id.* According to the questionnaire, Primm could only occasionally look up or down or turn his head to either side, and could only rarely hold his head in a static position. *Id.* at 458. It stated that Primm could, with his right arm, only occasionally lift 5 pounds, lift nothing frequently, use his arm only occasionally below shoulder

---

[3] Primm's counsel specifically asked the ALJ to leave the record open after the hearing because he wanted "to get Dr. Lopez to clarify" what his work limitations meant. R. 61. Rather than clarifying information from Dr. Lopez, however, Primm submitted the October 2016 questionnaire from Dr. Montella, from whom, as noted, there is no record evidence since the January 2008 letter referenced here.

level, and never above his shoulder. *Id.* With his left arm, it stated Primm could occasionally lift 10 and frequently lift 5 pounds, and only occasionally use his arm above or below shoulder level. *Id.* It stated that Primm could not use his right hand to grasp, turn, or twist objects or manipulate with his fingers, and could perform the same operations with his left hand and fingers only 50 percent of the time. *Id.* at 459. According to the questionnaire, Primm had good and bad days, and could expect to be absent from work more than four days per month. *Id.*

III.    **Hearing Testimony**

    A.    **Primm's Testimony**

At the hearing, Primm testified that he is right-arm dominant and, consistent with his medical records, was treated for his right shoulder, elbow, and neck following his 2006 injury. *Id.* at 57-58. He stated that his shoulder locks up and clicks and is still painful. *Id.* He testified that while his range of motion improved after shoulder surgery and he is able to lift his arm over his head, he cannot do anything with it. *Id.* at 57-58, 62. Primm explained that he had cubital tunnel release surgery for the pain in his elbow, but it did not help. *Id.* at 64. According to Primm, he cannot use his right arm to type, lift, cut food, sign his name, or assist his left hand, and his arm gets swollen randomly, including if he drives for about a half hour, but he does not drive more than a couple of miles each week. *Id.* at 65-67, 71, 72. He testified that his neck pain started the day of his injury, and that he has taken medication and steroid injections for it, but that it still bothers him with pain radiating to his fingertips. *Id.* at 64, 69. He said that he could stand for just 45 minutes to one hour at a time, but

that if he could "stretch out, lay down" or "do something" to relieve the pain, he could "maybe go another half hour." *Id.* at 55-56. He testified that he has trouble sleeping and is unable to help around the house, and that his pain comes and goes. *Id.* at 65-68. According to Primm, about half his days are bad, and on half of the bad days, he does not leave the house and tries to make himself more comfortable by adjusting his position. *Id.* at 68-69.

Primm stated that Dr. Lopez—who performed his shoulder and cubital tunnel release surgeries—told him he would not be able to go back to work "doing anything lifting," but did not talk to him about specific work restrictions, and no doctor did more than advise him not to "accomplish lifting with both hands where I would compensate for the left and end up causing problems with that." *Id.* at 63-64. He stated that it had been "over a year" since he had seen Dr. Lopez, because "there's nothing more that really they could do other than just prescribe painkillers," and that he does not take medication because it does not relieve the pain and leaves him feeling foggy and incoherent. *Id.* at 55-56; 66. Primm did not testify regarding treatment or consultations with any other doctor. He indicated that he has had continuous health insurance since leaving work in 2006. *Id.* at 56. He testified that he had been receiving $333 per week as a result of his workers' compensation claim, but recently received a lump sum award of about $300,000. *Id.* at 73. He further testified that despite working with two vocational rehabilitation counselors, he could not find a job. *Id.* at 69. Primm also briefly mentioned his 1998 knee surgery, indicating that he weighed 190 pounds at that time, but approximately 250 pounds now. *Id.* at 45, 55.

### B.     Vocational Expert Testimony

Vocational expert Brian Harmon also testified at the hearing. The ALJ asked Harmon to consider a hypothetical individual with Primm's background who was capable of performing light level work, where the individual: could lift a maximum of 15 pounds at any one time, and up to 10 pounds more frequently; had no limitations in his ability to sit, stand, or walk throughout the workday; could never push or pull on the right with his right upper extremity, and using his left only, not to exceed 15 pounds of force; could never crawl or climb ladders, ropes, or scaffolds; could not perform repetitive rotation, flexion or extension of the neck; could never work overhead with either arm; could frequently but not constantly perform fine and gross manipulation with either upper extremity; and could not perform forceful grasping or torqueing. *Id.* at 75-76. Harmon estimated that numerous jobs existed in the nation that this hypothetical individual could perform, citing by way of example sales attendant (400,000 jobs) and inspector (50,000 jobs). *Id.* at 76-77, 80.

The ALJ then added to the characteristics of the hypothetical individual, asking Harmon to consider the additional limitation of being able to reach in all directions with his right upper extremity other than overhead only occasionally, and only occasionally performing fine and gross manipulation with the right upper extremity. *Id.* at 77. Harmon responded that such an individual could perform the job of usher (estimating 50,000 jobs in the nation), and mail clerk (estimating 60,000 jobs in the nation), and that again these were just examples of suitable jobs, not an exhaustive list. *Id.* Finally, the ALJ again added to the characteristics of the

hypothetical individual, indicating that all limitations remained from hypotheticals one and two, but the individual also had no effective use of his right upper extremity. Harmon responded that this limitation would eliminate any available jobs for the hypothetical individual. *Id.*

The ALJ concluded by asking whether Harmon's testimony conflicted with the Dictionary of Occupational Titles, and Harmon responded that it did, but then clarified to explain how his experience allowed him to supplement what the DOT provides regarding overhead reaching:

> Q (by ALJ): Do you – has any of your testimony conflicted with the *Dictionary of Occupational Titles*? And again, that's a yes or no question, Mr. Harmon?
>
> A: Yes.
>
> Q: It's conflicted with the *Dictionary of Occupational Titles*? What testimony did you offer that conflicts with the *Dictionary of Occupational Titles*?
>
> A: Well, the ability to perform the jobs I testified to within the hypotheticals because I – utilizing you know, perform the jobs with no overhead reaching for example.
>
> Q: So, if I looked at these jobs, the *DOT* will say they do require overhead lifting – or reaching?
>
> A: Reaching is indicated in the *DOT* and the *SCO*, but not overhead reaching, so the ability to perform these jobs within the hypotheticals is based on my experience and including one-armed jobs and absences.
>
> Q: Okay, and I'll just make note of my understanding that supplementing or clarifying information that's in the *Dictionary of Occupational Titles* in this Judge's opinion does not establish a conflict, nor did I ask whether your testimony [sic] in all ways consistent with the *Dictionary*, but – *Dictionary of Occupational Titles* and I will certainly evaluate the credibility of Mr. Harmon's testimony after this hearing.

*Id.* at 86.

## C. The ALJ's Decision

The ALJ determined that Primm had severe impairments of arthropathies and obesity. *Id.* at 12. After concluding that Primm's impairments did not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)—an argument Primm did not advance—the ALJ discussed in detail the medical evidence, giving "great weight" to treating orthopedic surgeon Dr. Lopez's opinions that Primm could return to "light duty" work with restrictions because of his "long-term relationship" with Primm and his consistent opinion regarding Primm's restrictions, and giving no weight to treating physician and cervical spine specialist Dr. Montella's opinion, because his treatment records were not submitted and his late-submitted recommendations conflicted with Dr. Lopez's opinion and other record evidence. *Id.* at 15-20. In so doing, the ALJ also discussed Primm's testimony, Dr. Spencer's opinions, the 2008 FCE (assigning it "mixed weight"), the 2011 vocational evaluation (assigning it "no weight"), and the Commissioner's 2015 consultative evaluation (assigning it "little weight" because the medical consultant did not examine Primm). The ALJ did not discuss Dr. Verma's 2007 IME or the 2011 workers' compensation arbitration decision. Considering the evidence, the ALJ "recognize[d] that claimant has limitations based on his upper extremity and neck issues," and therefore found that Primm had the residual functional capacity (RFC):

> [T]o lift and/or carry up to 15 pounds occasionally and 10 pounds frequently, and has no limitations in his ability to sit, stand or walk throughout an 8 hour workday. The claimant can never push or pull using his dominant right upper extremity, and can push and pull using

15 pounds of force using his left upper extremity. The claimant can never crawl, and he can never climb ladders, ropes or scaffolds. He cannot perform repetitive flexion, rotation, or extension of his neck. He can never work overhead with either arm. The claimant can perform fine and gross manipulation frequently but not constantly, and is incapable of forceful grasping or torqueing.

*Id.* at 13, 20. Although the ALJ determined that Primm's RFC did not enable him to perform the full range of light work, he concluded—based on the vocational expert's testimony—that there were a significant number of jobs that an individual with his limitations (and more) could perform. *Id.* at 21-22. Accordingly, the ALJ determined that Primm was not disabled. *Id.* at 22.

### Standard

Judicial review of a final decision of the Social Security Administration is generally deferential. The Social Security Act requires the court to sustain the ALJ's findings if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court should review the entire administrative record, but must "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the [ALJ]." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "However, this does not mean that [the court] will simply rubber-stamp the [ALJ's] decision without a critical review of the evidence." *Id.* A decision may be reversed if the ALJ's findings "are not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Id.* In addition, the court will reverse if the ALJ does not "explain his analysis of the evidence with enough detail and clarity to permit

meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). "Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."). Additionally, the ALJ "has a duty to fully develop the record before drawing any conclusions," *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007), and deference in review is "lessened . . . where the ALJ's findings rest on an error of fact or logic." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). In oft-quoted words, the Seventh Circuit has said that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. When the ALJ has satisfied these requirements, the responsibility for deciding whether the claimant is disabled falls on the Social Security Administration, and, if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the ALJ's decision must be affirmed. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

## Analysis

To determine whether an individual is disabled, an ALJ must follow the five-step analysis provided by 20 C.F.R. § 404.1520(a)(4). At step one, if the ALJ determines that the claimant is "doing substantial gainful activity," then the claimant is not disabled and no further analysis is necessary. If the claimant is not engaged in gainful activity, at step two, the ALJ must determine whether the

claimant has a "severe" impairment or combination of impairments. If the ALJ finds that the claimant has such a severe impairment, and the impairment is one provided for in the Social Security regulation listings, then at step three, the ALJ must find that the claimant is disabled. If the ALJ finds that the impairment is not in the listings, then at step four, the ALJ must assess the "residual functional capacity" ("RFC") the claimant continues to possess despite the claimant's impairment. If the claimant's RFC enables the claimant to continue his or her "past relevant work," then the ALJ must find that the claimant is not disabled. But if the claimant cannot perform past relevant work, at step five, the ALJ must determine whether the claimant "can make an adjustment to other work." If the claimant cannot make such an adjustment, then the claimant is disabled. Here, Primm does not challenge the ALJ's decision at steps one, two, or three.[4] Rather, Primm argues that the ALJ erred at steps four and five.

## I. Step Four: Primm's RFC

Primm asserts that the ALJ improperly assessed his residual functional capacity by: 1) failing to account for all of his limitations; 2) finding, based on impermissible inferences, that his hearing statements were not entirely consistent with the evidence; and 3) wrongly rejecting opinions by medical and non-medical professionals. Dkt. 9 at 7-15. The Court will examine each argument in turn.

---

[4] Although the Commissioner understood Primm's motion to include a challenge to the ALJ's decision at step two, Primm indicated in his reply brief that he does not challenge that step. Accordingly, the Court will not address it here.

## A.    The ALJ's Assessment of Primm's Limitations

Primm asserts that the ALJ failed to consider all of his impairments, in combination, in determining his RFC. An ALJ must consider all impairments, severe and non-severe, in determining a person's RFC, including any deficiencies a claimant may have in concentration, persistence, or pace. 20 CFR 404.1545(a); *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir 2010). While no single impairment might significantly limit an individual's ability to work, the combination of impairments could impose greater restrictions. *Thomas*, 745 F.3d at 807.

Primm argues that although the ALJ acknowledged that he suffers from non-severe depression with sleep disturbances and fatigue, the ALJ failed to consider limitations arising out of his depression. According to Primm, these limitations include personality and mood changes without medication, difficulty concentrating and light sensitivity when on medication, the physical limitations and feelings of worthlessness Primm has about fifty percent of days, and how, on a bad day, he frequently cannot leave the house, and can get relief only by adjusting his position. Dkt. 9 at 9; Dkt. 15 at 2-3.

The ALJ's decision in this regard was well supported and will not be disturbed. The ALJ noted that while Primm's counsel stated that Primm suffers from depression, that allegation was not developed in the record, and therefore it would neither be considered severe nor result in the imposition of any work-related limitations. R. 12. The ALJ pointed to an April 13, 2013 encounter summary

completed by Primm's primary care physician indicating Primm's reports of sleep disturbances and fatigue, but stating Primm "reports no depression." *Id.* at 12, 387. Additionally, as explained below, the ALJ did not err in discounting Dr. Montella's October 21, 2016 "Residual Functioning Capacity Questionnaire" in which Dr. Montella reported that Primm suffered from depression, including because that form was completed outside of the relevant period for determining disability, and none of Dr. Montella's treatment notes to that effect are in the record. *Id.* at 18. There are no other complaints of depression in the medical records, and Primm did not testify regarding any alleged depression at the hearing.[5]

Primm also contends that the ALJ "completely ignored" the lingering restrictions Primm has in his right knee following his 1998 surgery to find that he has no limitations in his ability to sit, stand, or walk during an 8-hour work day. Dkt. 9 at 9; Dkt. 15 at 3. The Court will not disturb the ALJ's decision on this basis either. The ALJ determined that "there is no reason for [Primm]'s purported limitations in sitting, standing, and walking," since "his complaints consistently concerned his cervical spine and upper extremities." R. 18. The ALJ recognized that Primm had knee surgery in 1998, but noted there is "no subsequent record of abnormal gait, muscle weakness or atrophy in his legs," citing the April 13, 2013 encounter summary from Primm's primary care physician indicating the same. *Id.* (citing R. 287). Again,

---

[5] Although Primm did testify to sleep problems, at times being unable to leave the house, and the need to switch positions frequently, that testimony was in the context of Primm's physical pain, not related to any depression. *See* R. 65-69. As discussed below, the ALJ determined based on substantial evidence that Primm overstated his symptoms in any event.

but for Dr. Montella's too-late October 21, 2016 "Residual Functioning Capacity Questionnaire" calling for numerous restrictions related to Primm's ability to sit, walk, and stand (among others), the medical records are in accord with the ALJ's determination. Therefore, the ALJ's decision not to include these limitations in the RFC was properly articulated based on substantial evidence and will not be disturbed. *See Kirsch v. Colvin*, 2013 WL 5498089, at * 10 (N.D. Ill. Oct. 2, 2013) (finding no error in ALJ's failure to address few pieces of evidence of arm and hand limitations where "the focus of the medical reports, [claimant's] testimony, and [claimant's] application for disability were [claimant's] back and shoulder pain, *not* any hand or arm limitations" (emphasis in original)).

## B. The ALJ's Finding that Primm's Statements Regarding His Symptoms Were Not Entirely Consistent with the Evidence

Primm next takes issue with the ALJ's finding that his statements were not entirely consistent with the evidence. An ALJ is entitled to determine whether a witness's testimony is credible. *See Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). A court should "uphold an ALJ's credibility determination if the ALJ gave specific reasons for the finding that are supported by substantial evidence," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), and will not disturb it unless it is "patently wrong . . . unreasonable or unsupported." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Primm argues that the ALJ "failed to build a logical bridge between the evidence and his rejection of [Primm's] statements," asserting that while an ALJ may assess whether a claimant's alleged symptoms are consistent with the medical

evidence under SSR16-3p[6], "he may not simply reject a [claimant's] claims because he believes he is untruthful." Dkt. 9 at 9-10. Primm points to the ALJ's interruptions of Primm's counsel's questioning and challenges of Primm on what he perceived to be inconsistencies between his testimony and written reports as evidence that the ALJ did just that. Primm also objects to the ALJ's consideration of the fact that Primm's pain comes and goes and that he had not consistently received treatment as evidence that he may be exaggerating. Dkt. 9 at 10. Primm asserts that Dr. Lopez informed him there was nothing more he could do to help him, having performed surgeries, and administered medication and steroid injections—among other attempts at treatment—through the years. *Id.*

The ALJ's finding that Primm's testimony was not "entirely consistent" with the record was sufficiently supported. First, that the ALJ questioned Primm during the hearing and engaged with Primm's counsel is of no moment. Resolving

---

[6] Social Security Rulings, or "SSRs," "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). SSR 16-3p is titled "Titles II and XVI: Evaluation of Symptoms in Disability Claims." *See* 2016 WL 1119029 (Mar. 16, 2016). On March 16, 2016, the Social Security Administration rescinded SSR 96-7p and replaced it with SSR 16-3p, which eliminates the term "credibility" and clarifies that "subjective symptom evaluation is not an examination of an individual's character," but otherwise adheres to the same two-step process previously used by ALJs under SSR 96-7p to evaluate claimants' reported symptoms. *See id.*; *Barrera v. Berryhill*, 2017 WL 680427, at *6 (E.D. Wis. Feb. 21, 2017). That process includes determining whether there is "an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms," and, if there is, evaluating "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*

evidentiary inconsistencies is the ALJ's role. *See* 20 C.F.R. § 404.1529(c)(4) ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence."); SSR 96-8p (an ALJ must "explain how material inconsistencies in the evidence in the case record were considered and resolved.").

Second, the ALJ sufficiently supported his determination that Primm did not report the same symptom severity to his doctors as he alleged in connection with his disability claim. R. 17. The ALJ noted Primm's hearing testimony that he could not use his right hand, could not use his right arm in any meaningful way, and was unable to lift anything with his right arm because his shoulder "locks up." *Id.* at 14. While his medical records reflect concerns with the use of his right upper extremity, the ALJ found that they also are replete with Dr. Lopez's consistent findings that Primm was capable of returning to work with recommended restrictions that are consistent with, and, in some respects more permissive than, the RFC. *Id.* at 16. In fact, the ALJ found that the medical evidence—including the 2008 FCE and Dr. Lopez's treatment records and recommendations—demonstrated that Primm "had recovered from his upper extremity injuries and surgeries, and that he was capable of performing considerable work activities" at least as of June 2010. *Id.* at 15, 16 (citing R. 301-302, 305, 361-363, 375-380 (2008 FCE, April 2010 x-rays and June 2010 shoulder MRI, and Dr. Lopez's April through September 2010 treatment records and letters to Primm's primary care physician analyzing same and indicating Primm could return to light duty work with restrictions)). The ALJ also examined more

recent evidence—carefully reviewing Dr. Lopez's medical findings after appointments in and around Primm's date last insured—and concluded that it did not "support the degree of limitation alleged." *Id.* at 16, 17 (citing R. 292-293, 389-391, 392-394, 395-397, 438 (Dr. Lopez's 2014 and 2015 treatment notes, and Primm's September 2014 EMG indicating that Primm still could return to work with consistent restrictions)). The ALJ pointed specifically to Dr. Lopez's opinion after Primm's April 2014 appointment recommending only "conservative management," and subsequent visits continuing to recommend that Primm return to light duty work. *See id.* at 16-17, 262, 407-409, 414-416, 454. Finally, the ALJ observed that while Primm frequently complained of pain in his right upper extremity and neck during the course of his treatment, he did not complain of knee pain, and nor did Dr. Lopez ever assess restrictions regarding Primm's ability to walk, sit, or stand. *Id.* at 17, 18. Thus, but for Dr. Montella's October 2016 questionnaire—which, as discussed above and below, is of questionable relevance and credibility in any event—the ALJ found no evidence of Primm's purported limitations in sitting, standing, and walking. *Id.* at 18.

The ALJ also considered the fact that Primm did not receive continuous treatment despite having insurance, noting that Primm did not see Dr. Lopez between December 22, 2010 and April 21, 2014, notwithstanding the fact that Dr. Lopez advised him to return as needed. *Id.* at 16, 17, 302.[7] There are no other treatment records for that period. Although Primm testified that his pain comes and

---

[7] In addition, the ALJ noted that while Primm alleged disability as of May 2006, he did not apply for disability insurance benefits until nearly eight years later in March 2014. R. 14.

goes, the Court agrees that Primm's failure to seek treatment for almost three-and-a-half years belies the severity of his complaints. *See* SSR 16-3p ("if the frequency or extent of treatment sought by an individual is not comparable with the degree of the individual's subjective complaints . . . we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of the record").

Primm contends further that the ALJ violated SSR 16-3p by emphasizing "minor" inconsistencies in his decision. Dkt. 9 at 10-11 (emphasis omitted). Specifically, the ALJ's finding Primm's meetings with a vocational counselor in 2009 and 2010 to be at odds with his contention that he was physically unable to work, and his testimony that he could only drive a few miles inconsistent with his statement 5 years earlier that he could drive 35-40 miles at a time. Dkt. 9 at 10-11; R. 17-18. Primm argues, in the first instance, that he cannot be faulted for making a good faith effort to return to work, and in the second, that his testimony was evidence of the fact that his condition has been steadily worsening. Dkt. 9 at 11. Primm also takes issue with the ALJ's reliance upon Primm's workers' compensation award to infer that Primm would not be motivated to seek work. Dkt. 9 at 11; R. 18. Although the Court agrees that these inconsistencies seem trivial, the ALJ himself indicated that they were "minor," and served simply to bolster his determination that Primm's testimony was not entirely credible. R. 14-20. Thus, even if the ALJ did err in considering these facts, the error was harmless, given the ALJ's otherwise well-supported evaluation of Primm's subjective allegations. *See Shideler*, 688 F.3d at 312 (noting that an ALJ's

credibility determination need not be perfect to survive judicial review); *Bell v. Apfel*, 2000 WL 1015897, at *6 (7th Cir. 2000) ("Though the ALJ erred in one part of his credibility determination, the error was harmless because the remainder of his assessment . . . is supported by consistent and substantial evidence.")).

Finally, even though the ALJ found certain testimony regarding Primm's subjective symptoms lacking in support, he nevertheless accommodated his purported neck symptoms in the RFC. Indeed, the RFC extends beyond what treating physician Dr. Lopez observed with consistency during the pertinent period to conclude that Primm could not perform repetitive flexion, rotation, or extension of his neck. *See Damit v. Colvin*, 2016 WL 3568088, at *10 (N.D. Ill. June 24, 2016) (upholding ALJ decision explaining reasons for credibility determination and adding limitations to RFC accounting for certain testimony she found not credible). The ALJ properly used his discretion to assess Primm's subjective symptoms based on the listed evidence relied upon. The ALJ's rationale for discrediting Primm's testimony concerning his subjective symptoms was thus supported by specific reasons, and not "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). The Court will not disturb his decision on this basis.

## C.    The ALJ's Assessment of Opinion Evidence

Finally, Primm contends that the ALJ's asserted reasons for rejecting professional opinions of certain qualified medical and non-medical persons were unsupportable.

### 1.  The ALJ's Rejection of Treating Physician Dr. Bruce Montella's Opinion

Primm argues that the ALJ wrongfully gave no weight to Dr. Montella's opinion, despite that he had been treating Primm since his injury in 2006. "A treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 CFR § 404.1527(d)(2)). If an ALJ declines to give controlling weight to the claimant's treating physician, he must offer "good reasons" for doing so. *Id.* "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider various factors to determine what weight, if any, to afford the treating physician's opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Those factors include: 1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; and 5) the consistency and support for the physician's opinion. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); 20 C.F.R. § 404.1527(c)(2). If, after consideration of these factors, the ALJ discounts the treating physician's opinion, the ALJ's decision will stand so long as the ALJ "minimally articulate[d]" his or her reasons for doing so. *Elder*, 529 F.3d at 415 (internal quotation marks omitted).

Primm contends that the ALJ's finding that headaches reported by Dr. Montella were not well documented in the treatment records was a mere

"distraction," since headaches "have little to do with [Primm's] purported limitation." Dkt. 9 at 13. Primm argues that the ALJ's rejection of Dr. Montella's opinion regarding Primm's lower extremity limitations also was a "distraction," since he neither performed Primm's knee surgery, nor had access to related records. *Id.* Yet in his efforts to explain away these inconsistencies, Primm reveals his position's shortcomings. The lower extremity limitations Dr. Montella reported in October 2016 are *the only* evidence besides Primm's own self-serving testimony regarding his ability (or lack thereof) to sit, stand, and walk. In admitting Dr. Montella's lack of knowledge about Primm's knee surgery, Primm calls into doubt the questionnaire's relevance and Dr. Montella's—and indeed his own—credibility. The ALJ's consideration of Primm's alleged headaches in assessing the weight to afford Dr. Montella's opinion also was not error, because, as the ALJ notes, not only are such headaches not reflected in the evidence, but also their alleged occurrence is contradicted by a September 2014 visit summary stating "no headaches or dizziness," and Primm's own failure to check boxes marked "headaches" or "headaches/migraine" in an April 2014 medical questionnaire, despite two opportunities to do so. R. 18 (citing R. 437, 451, 453).

Importantly, the ALJ also correctly observed that Dr. Montella's treatment notes are not in the record, and that the October 2016 questionnaire falls more than *two years* past Primm's date last insured.[8] *Id.* It is thus impossible to assess the

---

[8] The Court notes that two of Dr. Montella's letters to Primm's primary care physician dated June 2006 and January 2008 are in the record, and that the ALJ did not address either. However, the ALJ's failure in this regard is inconsequential, given the

nature and extent of Primm's treatment relationship and frequency of examination with Dr. Montella, types of tests performed, or to fully assess the consistency and support for Dr. Montella's opinion. *See Larson*, 615 F.3d at 751; *see also* 20 C.F.R. § 404.1527(c)(2). Nor can Primm fault the ALJ for failure to develop the record; the ALJ encouraged Primm's counsel to submit additional evidence and indeed held the record open until Primm's counsel represented, nearly two months later, that there was nothing more to submit. *See* R. 61-62, 71, 280, 281; *see also Casey v. Barnhart*, 30 Fed. Appx. 620, 624 (7th Cir. 2002) (ALJ's duty to develop record satisfied because ALJ is "entitled to assume that an applicant represented by counsel 'is making his strongest case for benefits,'" and ALJ gave numerous opportunities to supplement record) (citing *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)). The ALJ made no error factoring this into his credibility determination. As the Seventh Circuit has noted, "it is not unheard of that a personal physician 'might have been leaning over backwards to support the application for disability benefits.'" *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (no error in credibility determination where physician submitted a letter 4 years after claimant's date last insured but no office notes or medical records for the one-and-a-half-year period following surgery).

---

extensive eight-and-a-half-year period of silence between the most recent of such letters and Dr. Montella's October 2016 questionnaire. Nor must the ALJ address every piece of evidence in any event. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("An ALJ is not required to discuss every piece of evidence.").

Moreover, while Primm characterized the ALJ's decision as giving credence to Dr. Spencer's opinion over Dr. Montella's, the Court is unconvinced. Dkt. 9 at 13. Instead, the ALJ considered Dr. Spencer's opinion along with the other record evidence—particularly Dr. Lopez's opinions—in assessing the weight to afford Dr. Montella's late-prepared questionnaire. Indeed, the ALJ's references to the "great weight" he afforded Dr. Lopez's opinion—supported in abundance by citations to treatment records—made clear that Dr. Lopez's opinion was influential. R. 19, 20. And rightly so: Dr. Lopez saw Primm more frequently than any other doctor, performed both of Primm's relevant surgeries, and treated Primm for the upper right extremity and cervical issues the records before the ALJ address. The ALJ's noting the consistency between Dr. Lopez's opinion, Dr. Spencer's, and the RFC was not error.[9] *Id.* at 16, 18.

Lastly, Primm faults the ALJ for crediting Dr. Montella's representation of Primm's limited neck movement and accounting for it in the RFC, even as he doubted the necessity for doing so. Dkt. 9 at 13-14; R. 19. This position is nonsensical, at best. After a careful review of the medical evidence, the ALJ concluded that "the record does not reflect 50% reduction of claimant's neck motion," given the medical records "document[ing] claimant having normal range of motion of the neck." R. 19. The ALJ

---

[9] Primm argues that the ALJ's decision to afford weight to Dr. Spencer's opinion was contrary to the arbitrator's conclusion in his workers' compensation case rejecting Dr. Spencer's opinion. But the arbitrator's opinion does not affect the validity of the ALJ's determination, and, at the time of the hearing, was over 5 years old in any case. *See Perkins v. Colvin*, 632 Fed. Appx. 849, 853 (7th Cir. 2015) ("Even if the ALJ should have explicitly discussed the [workers' compensation decision], that decision was not binding on the ALJ because it is not based on Social Security law.").

also pointed to the inconsistency between Dr. Montella's opinion and Dr. Spencer's finding that there was "no objective evidence" of a cervical spine problem. *Id.* Nevertheless, the ALJ took "into account [Primm's] allegations" and "placed limitations regarding [Primm's] neck movement." *Id.* The ALJ thus more than "minimally articulated" his reasons for discounting Dr. Montella's opinion but accounting for Primm's purported neck limitations in the RFC in any event. His decision will not be disturbed on this basis.

### 2. The ALJ's Rejection of Certified Rehabilitation Counselor Kari Stafseth's Opinion

Primm next questions the ALJ's decision to assign no weight to certified rehabilitation counselor Kari Stafseth's 2011 opinion that Primm had "disability which is total," arguing—without legal support—that the ALJ erred because Stafseth offered an opinion in her area of expertise that was consistent with Primm's "history of unsuccessful attempts to obtain alternative employment" and workers' compensation award. Dkt. 9 at 14-15.

The ALJ provided three reasons for rejecting Stafseth's opinion. First, the opinion was not that of a treating source or medical professional. R. 19. Second, the record did not reveal Stafseth's familiarity with "SSA standards for disability." *Id.* Third, her opinion was inconsistent with the FCE, which identified jobs Primm could perform. *Id.* The Court will not upset this determination. Ultimately, the "[o]pinion that [a claimant is] disabled" is "reserved to the Commissioner," and opinions from others on whether a claimant is disabled are "give[n] [no] special significance." 20 C.F.R. § 404.1527(d)(1), (3). Moreover, not only was the ALJ correct that Stafseth's

opinion was not that of a medical professional or other treating source and the FCE identified potential jobs for Primm, but also there can be no dispute that the standards Stafseth relied upon are different from those relevant here. As the ALJ noted, Stafseth opined that Primm's unsuccessful participation in vocational rehabilitation services indicated the lack of access to a viable and stable labor market. R. 19. But SSR regulations require a determination of whether "jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity," and that determination expressly does *not* turn on the success of an individual's job search. *Id.*; *see also Chavez v. Berryhill*, 895 F.3d 962, 964 (7th Cir. 2018), *cert denied*, No. 18-6382, 2019 WL 113285 (U.S. Jan. 7, 2019) ("The agency does not tally the number of job openings at a given time, but rather approximates the number of positions that exist," "without regard to . . . a claimant's likelihood of being hired. In the same vein, the regulations direct that other factors . . . such as economic conditions or an employer's hiring practices, are not to affect step-five estimates of job numbers." (internal citations omitted)); 20 C.F.R. § 404.1566(a), (c) ("We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of— (1) Your inability to get work; (2) Lack of work in your local area" and "(6) No job openings for you" (among other things)). Accordingly, there was no error here.

### 3. The ALJ's Assessment of the Functional Capacity Evaluation and Dr. Lopez's Opinion

Primm argues that the ALJ erred in giving the October 8, 2008 functional capacity evaluation "mixed weight"—adopting the FCE assessment that Primm was "capable of light exertional level work" as consistent with Dr. Lopez's opinions, but declining to adopt the conclusion that Primm was to avoid simple grasping, pushing/pulling, and fine manipulation with the right upper extremity. Dkt. 9 at 15; R. 19. Primm argues that the ALJ erred in failing to explain the relationship between Primm and the evaluator, and inadequately explained his reliance upon Dr. Lopez's opinion to discount the conclusion regarding his right upper extremity. Dkt. 9 at 15. Primm points to no evidence that the ALJ should have questioned the relationship between himself and the evaluator. Primm's second argument also fails, because the ALJ's conclusion was sufficiently supported and articulated. The ALJ indicated in the RFC that Primm "is able to perform fine and gross manipulation frequently," pointing to the FCE itself—noting it indicated an average grip strength on the right of 57 pounds, and 125 pounds on the left—and to Dr. Lopez's opinion and long-standing relationship with Primm in support. *Id.* The ALJ specifically called out Dr. Lopez's consistent recommendation that Primm avoid overhead reaching and repetitive work, and his assessment that Primm could lift up to 15 pounds. *Id.* The Court finds no error here.[10]

---

[10] While the Court finds that the ALJ otherwise discussed Dr. Lopez's opinions, findings on examination, and Primm's test results with sufficient depth in his decision, the Court notes that the ALJ failed to explain why the RFC does not reflect Dr. Lopez's other consistent recommendation that Primm avoid pushing and pulling—a recommendation that is identical to that in the FCE. The RFC instead provides that Primm may not push or pull using his dominant right upper extremity, but can push and pull with his left using 15 pounds of force. R. at 20. Nevertheless,

## II.     Step Five: The ALJ's Acceptance of Vocational Testimony

Finally, in disputing the ALJ's determination that Primm could perform other work in the national economy, Primm argues that the ALJ improperly accepted vocational testimony that is inconsistent with the DOT, because the VE explained that the DOT specifies reaching generally, but not overhead reaching in particular. Dkt. 9 at 15-16; R. 86. Primm contends that this inconsistency meant that jobs such as "sales attendant"—which, according to the DOT, involves obtaining merchandise from a stockroom and arranging it on shelves and racks—were deemed available to him, but that he is physically unable to work in such a position if required to reach overhead. Dkt. 9 at 15-16.

Pursuant to SSR 00-4p, an ALJ must "inquire, on the record," regarding whether the VE's testimony is "consistent with the occupational information supplied by the DOT." If a conflict is noted, the ALJ must resolve it "by determining if the explanation given by the VE is reasonable and provides a basis for relying on the VE testimony rather than on the DOT information." SSR 00-4p. Here, not only did the ALJ inquire about any potential conflicts between the VE testimony and the DOT, but also the ALJ required the VE to explain the conflict he reported. R. 45-46. The VE explained that the DOT specified only reaching generally, and that his determination that Primm could perform the jobs identified was based on his

---

it is not difficult to discern from the medical evidence why the ALJ limited Primm totally with respect to his right upper extremity and not his left, and the Court finds that the ALJ was generous in restricting Primm's left side at all. Accordingly, the Court will not disturb the ALJ's decision on this basis.

experience that the jobs did not require overhead reaching. *Id.* The ALJ stated that his "understanding that supplementing or clarifying information that's in the *Dictionary of Occupational Titles* in this Judge's opinion does not establish a conflict." *Id.* at 45-46. The Court agrees. *See Collins v. Berryhill*, 743 Fed. Appx. 21, 26 (7th Cir. 2018), *petition for cert. filed*, No. 18-7193 (U.S. Dec. 21, 2018) ("Because the DOT does not specify whether jobs allow for changing from sitting to standing, the VE's testimony supplemented the DOT and did not conflict with it."). But even if there was a conflict, the VE's explanation was reasonable, and the ALJ did not err in relying upon it. *See Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008) ("An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience or knowledge in a given situation exceeds that of the DOT's authors.") (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).

## III. The Standard of Review

Primm asserts in his reply brief that the Commissioner misstated the standard of review, pointing out that the Commissioner "rel[ied] on relatively antiquated case law," taking issue in particular with the Commissioner's reliance upon the Seventh Circuit's decision in *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989), which held that "[e]ven if substantial evidence would support an opposite conclusion, the Commissioner's decision must be upheld if it is supported by substantial evidence." Dkt. 15 at 1-2. Primm's argument appears to be that it is not enough that an ALJ's decision is supported by substantial evidence, it must also be well articulated. *See* Dkt. 15 at 2 (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (remand

appropriate if ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review")). Because the Court finds that the ALJ's decision was both supported by substantial evidence and articulated well in accordance with recent Seventh Circuit precedent, this argument is moot.

## Conclusion

For the foregoing reasons, the Commissioner's motion, Dkt. 13, is granted, and Primm's motion, Dkt. 8, is denied.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: February 7, 2019